**R. J. REYNOLDS TOBACCO COMPANY, Plaintiff,**

v.

**PHILIP MORRIS INCORPORATED, Defendant.**

**Lorillard Tobacco Company, Plaintiff,**

v.

**Philip Morris Incorporated, Defendant.**

**Brown & Williamson Tobacco Corporation, Plaintiff,**

v.

**Philip Morris Incorporated, Defendant.**

**Nos. Civ.1:99CV00185, Civ.1:99CV00207, Civ.1:99CV00232.**

United States District Court, M.D. North Carolina.

May 1, 2002.

Daniel R. Taylor, Jr., Kilpatrick Stockton, L.L.P., Winston-Salem, NC, Darryl R. Marsch, Winston-Salem, NC, Mark Andrew Stafford, Kilpatrick Stockton, L.L.P., Winston-Salem, NC, Randolph S. Sherman, Michael Malina, David S. Copeland, Eric Aaronson, Kaye Scholer, L.L.P., New York City, Richard M. Cooper, Steven R. Kuney, John E. Schmidtlein, Williams & Connolly, Washington, DC, for R. J. Reynolds Tobacco Co.

Jonathan Heyl, Smith Helms Mulliss & Moore, LLP, Greensboro, NC, Larry B. Sitton, Smith Helms Mulliss & Moore, Greensboro, NC, Amy Bogart Ostrander, Greenbert Traurig, Washington, DC, Matthew W. Sawchak, Smith Helms Mulliss & Moore, Raleigh, NC, Jerome I. Chapman, Hadrian R. Katz, Richard L. Rosen, L. Elizabeth Bowles, Amy E. Ralph, Anne P. Davis, Kendall Millard Arnold & Porter, Washington, DC, David Boies, Stephen R. Neuwirth, Boies Schiller & Flexner, LLP, Armonk, NY, Jonathan D. Schiller, Michael A. Brille, Samuel C. Kaplan, Boies Schiller & Flexner, Washington, DC, William Todd Thomas, Boies Schiller & Flexner, Palm Beach Gardens, FL, Stuart H. Singer, Boies Schiller & Flexner, Hollywood, FL, Gregory Gerald Holland, Robert R. Marcus, Smith Moore, L.L.P., Greensboro, NC, for Philip Morris Inc.

John M. Deangelis, Brooks Pierce McLendon Humphrey & Leonard, Greensboro, NC, James T. Williams, Jr., Jennifer Van Zant, Brooks Pierce McLendon Humphrey & Leonard, Greensboro, NC, Irving Scher, Bruce S. Meyer, August T. Horvath, Weil Gotshal & Manges, LLP, New York City, for Lorillard Tobacco Company.

Norwood Robinson, Robinson & Lawing, Winston-Salem, NC, Michael Lindsay Robinson, Winston-Salem, NC, Robert B. Bell, Wiley Rein & Fielding, Washington, DC, Ronald S. Rolfe, Victor L. Hou, Sara Darehshori, Cravath Swaine & Moore, New York City, for Brown & Williamson Tobacco Corp.

## MEMORANDUM OPINION

BULLOCK, District Judge.

Plaintiffs in these consolidated cases, R.J. Reynolds Tobacco Company ("RJR"), Lorillard Tobacco Company ("Lorillard"), and Brown & Williamson Tobacco Corp. ("B & W") (collectively "Plaintiffs") seek injunctive and declaratory relief and damages for alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (federal claims), and North Carolina General Statutes §§ 75–1, 75–1.1, 75–2, and 75–2.1, as well as for unfair competition under North Carolina common law (state claims) stemming from Defendant Philip Morris's ("PM") implementation of a retail merchandising program in October 1998 known as Retail Leaders. Plaintiffs contend that PM designed and executed Retail Leaders to monopolize and restrain trade in the United States cigarette market by paying retailers for advantageous display and signage space which Plaintiffs say restricts information needed by consumers, disrupts the price-setting mechanism of the market, and limits Plaintiffs' abilities to promote their products. This matter is presently before the court on

Defendant's motion for summary judgment as to all Plaintiffs claims.

### The Summary Judgment Standard

Summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party bears the burden of persuasion on the relevant issues. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party may survive a motion for summary judgment by producing "evidence from which a [fact finder] might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the motion is supported by affidavits, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *see also Cray Communications, Inc. v. Novatel Computer Sys., Inc.,* 33 F.3d 390, 393–94 (4th Cir.1994) (moving party on summary judgment motion can argue simply the absence of evidence by which the non-movant can prove her case). An antitrust plaintiff must offer proof based upon "the realities of the market" rather than upon an abstract theory of liability. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 230, 243, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).

In considering the evidence, all reasonable inferences are to be drawn in favor of the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [fact finder] could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505.

The summary judgment standard does not differ when applied to antitrust claims. *Thompson Everett, Inc. v. National Cable Adver., L.P.,* 57 F.3d 1317, 1322 (4th Cir. 1995). However, according to the Fourth Circuit, "because of the unusual entanglement of legal and factual issues frequently presented in antitrust cases, the task of sorting them out may be particularly well-suited for Rule 56 utilization." *Id.*

In considering Defendant's motion for summary judgment, the court has before it an exhaustive record consisting of extensive sales data, trends, and marketing conditions over two decades; answers to interrogatories and admissions by the parties; declarations and deposition testimony from executives and employees of all the parties; declarations and depositions of experts retained by the parties; declarations and depositions of retailers of cigarettes, and extensive briefs on all relevant issues filed by able counsel for all parties. In addition, the court has had the benefit of two evidentiary hearings, consisting of four full days of live testimony from key witnesses for the parties. Finally, the court has had the benefit on three separate occasions of oral argument on the relevant issues by counsel for the parties. The court is satisfied that the record is complete in all key respects, that there are no genuine disputes as to any material fact, and that the court can rule as a matter of law on the fully developed issues in this case.

After a careful review of the entire record, the court finds the following facts to be undisputed.

### FINDINGS OF FACT

#### A. Parties, Products, and Markets

1. RJR, Lorillard, and B & W are each engaged in the manufacture and distribution of cigarettes. RJR's primary brands include Winston, Camel, Salem, and Doral (the nation's leading discount brand). Lorillard's primary brands include Newport, the nation's second leading premium brand. B & W's primary brands include

Kool and GPC. PM is also engaged in the manufacture and distribution of cigarettes. PM's primary brands include Marlboro (the nation's leading premium brand), Merit, and Basic.

2. It is undisputed that the relevant product market for the purpose of this litigation is all cigarette sales through retail outlets and that the relevant geographic market is the United States.

3. Retail stores are comprised of pack and carton outlets. Pack outlets are comprised of convenience stores and gas stations where primarily cigarette packs are sold. Carton outlets are comprised of supermarkets and cigarette and tobacco stores where primarily cigarette cartons are sold.

4. The cigarette manufacturing industry historically has been highly concentrated. Market share figures for the parties here illustrate this point. In the third quarter of 2001, the four leading cigarette manufacturers, PM, RJR, B & W, and Lorillard, respectively, accounted for approximately 93.3% of all domestic retail cigarette sales, which is down from approximately 97.5% in 1998.

5. Although historically it has been highly concentrated, the cigarette manufacturing industry has seen the entry of several competitors in recent years. This recent entry is a response to the industry-wide price increases spurred, at least in part, by manufacturers' obligations under the Master Settlement Agreement.[1]

6. The share of the market held by "All Other Manufacturers" ("AOMs")[2] is significantly higher than it was in 1998, the year before the present suit was filed. Market share figures indicate that in 1998 AOMs accounted for approximately 2.5% of the retail cigarette market. Recent market share figures demonstrate that the AOMs' share of the market has more than doubled since that time, resulting in AOMs holding an approximate 6.7% share of the market in the third quarter of 2001. Within this growth of AOMs, there has been a significant increase in share of new entrants to the cigarette industry since 1998. New entrants' share has increased from 0.6% in 1996 to 4.1% as of August 2001, with most of this increase occurring after 1998. Although these share figures represent a small portion of the relevant market, this portion is significant.

7. Despite the rapid increase in the AOMs' share of the retail cigarette market, the cigarette manufacturing industry does exhibit some barriers to entry. AOMs face consumer loyalty to established brands. Although the Master Settlement Agreement purports to neutralize the cost disadvantages that signatory manufacturers experience, market data demonstrate that at present the Master Settlement Agreement is no more than a potential barrier to entry. The Master Settlement Agreement has not curbed AOMs' rapid expansion in recent years.

8. Overall cigarette consumption in the United States is declining. Thus, the market for retail cigarette sales is diminishing. As a result, Plaintiffs possess substantial excess capacity that would enable them to expand supply in order to meet any unsatisfied market demand.[3]

1. In an effort to recoup public health care costs and to reduce cigarette smoking, several states brought suits against the leading domestic cigarette manufacturers. A large majority of these suits were settled pursuant to the Master Settlement Agreement. Signatory manufacturers, as well as non-signatory manufacturers, are affected by the terms of the Master Settlement Agreement.

2. AOMs include new entrants as well as established cigarette manufacturers, such as Liggett Group, Inc., other than PM, RJR, B & W, and Lorillard.

3. In 2001, the Federal Trade Commission reported that domestic cigarette sales declined from approximately 524 billion cigarettes in 1990 to approximately 411 billion cigarettes

9. Within the industry, PM has a significant market share advantage over its competitors. In August 2001, approximately 51.3% of retail cigarette sales within the United States was of PM brands. This is more than twice the market share of RJR, PM's closest competitor, which had an August 2001 market share of approximately 22.3%. B & W and Lorillard trailed PM and RJR with August 2001 market shares of 10.9% and 9.3%, respectively. The gaps between PM and both RJR and B & W, its closest competitors, have steadily increased since the early 1980s, and more significantly so since 1993.

10. PM's leading market share position is driven primarily by its Marlboro brand, which is the dominant brand in the industry. In August 2001, Marlboro sales accounted for approximately 38% of all retail cigarette sales in the United States. The next closest brands, Lorillard's Newport and RJR's Camel, accounted for approximately 7.8% and 5.5% of the market, respectively.

B. *The Competition for Adult Smokers*

11. The market for retail cigarette sales is diminishing as the population of adult smokers decreases. Thus, in competing with each other, cigarette manufacturers seek to maintain brand loyalty with respect to their existing customers while also inducing purchases by adult smokers of other manufacturers' brands who occasionally buy different brands or who do not have a usual brand preference at the time of purchase. Although most adult smokers claim to have a "usual" brand, a significant percentage of adult smokers buy other brands on an occasional basis.

Moreover, adult smokers who are loyal to a particular brand sometimes switch to a different usual brand over time. Data suggest that a significant portion, estimated to be approximately 6 million, or 14%, of adult smokers have switched and do switch their usual brand.

12. The competition for switchers and occasional-use purchasers occurs primarily in pack outlets, where approximately 60% of all cigarettes are sold. This is because adult smokers are more likely to purchase a non-usual brand by the pack rather than by the carton.

13. In the competition for brand loyalty, manufacturers consider product visibility and advertising at the point of purchase as critical to remaining competitive. Visibility and advertising at the point of purchase are important to both the development and maintenance of brand equity and also to price and promotional competition among manufacturers.

14. Although visibility and advertising at the point of purchase are important in most if not all product categories in the retail store environment, they are uniquely critical in the cigarette industry. First, unlike other product categories sold in the convenience/grocery store environment, cigarette manufacturers face severe limitations with respect to advertising. Television and radio have long been off-limits to cigarette manufacturers. Moreover, as a result of the recent tobacco litigation settlements, outdoor advertising on billboards, distribution of logoed merchandise, and advertising at sports and other public events also have been limited severely or eliminated entirely. Cigarette manufac-

in 1999. Federal Trade Commission Cigarette Report for 1999, March 13, 2001, 2001 WL 273064 (F.T.C.). These figures demonstrate the decreasing demand that has resulted in each Plaintiff's substantial excess capacity. Each Plaintiff could increase production by a rate between 15% and 30%. (Expert Report of Kenneth G. Elzinga July 31, 2001, in Supp. of Def.'s Opp'n to RJR's Mot. to Modify the Prelim.Inj. at 23–24 (citing Pls.' Resps. to Def.'s Second Set of Interrogs.).)

turers are thus left with only three basic channels to communicate with adult smokers: print media, direct mail, and the point of purchase. PM and Plaintiffs use all three of these channels to communicate with adult smokers.

15. A further unique aspect of the cigarette industry is that because of concern about youth smoking there has been a recent shift in display space locations at the point of sale from self-service, counter-top displays to a non-self-service, back bar display behind a sales counter. In this environment, a customer approaches a counter and asks the clerk for the pack or carton of his choice from the display fixture on the back bar. Counter-top, end-of-aisle, or other self-service type displays that are often used in other categories, such as beverages or snacks, are, for the most part, no longer available to cigarette manufacturers.

16. At the start of this litigation, another characteristic of the back bar environment was that approximately half of the display space available to the cigarette category was below counter level and therefore out of the consumer's primary line of sight. Previously, when self-service counter-top displays were the customary method of displaying the cigarette category, the entire display space for the category was generally either on the counter-top or in above-counter displays on the back bar. In either location a manufacturer could easily communicate its brand equity and price message to the consumer. In contrast, some of the new back bar fixtures typically rise from the floor to a height of six-to-eight feet. The display space on the lower half of these fixtures can be obstructed by the sales counter, making it difficult for manufacturers whose products are on the lower half of the fixture to communicate brand equity and price messages to consumers.

17. Since the start of this litigation, RJR has created several methods of elevating the display space in order to improve visibility of products on the lower half of back bar fixtures. In the case of a low-profile fixture (about 52 to 53 inches in height), the entire fixture can be elevated and set atop the back bar. In the case of higher profile fixtures (which may be too tall to be elevated), the display space can be elevated by installing what are known as "block-out panels" on the bottom portion of the fixture. Block-out panels cover the bottom portion of the fixture, reducing the amount of visible space and creating the look of an elevated low-profile fixture. In either situation, the entire display space is at a height of approximately 36 inches or higher.

18. The critical importance of brand visibility and display space at the point of purchase in the cigarette industry is not disputed. It is evidenced by the fact that all four of the major manufacturers involved in this litigation vigorously compete for in-store display space and advertising by offering promotional payments and discounts for advantageous promotional space in stores in an effort to convey an "undiluted message" about their particular brands. Because of the significance of pack outlets in the competition for brand loyalty and occasional-use purchases, manufacturers usually offer greater retail display allowances (RDAs) to pack outlets as compared with carton outlets.

19. The RDA payments from cigarette manufacturers are typically passed on to consumers in the form of price discounts. Professor George A. Hay, RJR's economic expert, acknowledges that over the long run, RDAs will eventually be passed on to consumers. (Hay July 13, 2001, Dep. at 277, App. to Def.'s Mot. for Summ.J. at 823.) Thus, a retailer under a contract receiving RDA payments from PM will be

able to offer consistently lower prices on PM brands such as Marlboro than will a retailer who is not under contract.

### C. *PM's Retail Leaders Program*

20. In October 1998, PM announced that it was implementing "Retail Leaders," a new retail merchandising program to replace its "Retail Masters" program, which had been in existence since 1992. After a transitional period, during which participating retailers could operate under either a Retail Leaders or a Retail Masters contract, the Retail Masters program was to be terminated. The termination date for Retail Masters was originally March 31, 1999, but PM extended it to June 30, 1999.

21. Retail Masters included participation levels that enabled retailers to obtain significant promotional discounts from PM while still enabling them to negotiate promotional agreements with at least two competing manufacturers. With opportunities for at least three manufacturers to obtain significant in-store visibility and signage, all Plaintiffs had an effective opportunity to compete at the point of sale. Under the higher levels of Retail Leaders, however, there is often only one competing manufacturer able to obtain above-counter display space and signage.

22. As part of Retail Leaders, PM makes promotional payments (in the form of RDAs and growth fund payments) to retailers in exchange for favorable display, advertising, and promotional space within retailers' stores. These promotional payments are typically passed from retailers to consumers in the form of price discounts.

23. There are several levels of participation in Retail Leaders, the higher levels of which provide PM with more advantageous display, advertising, and promotional space in retail stores. To encourage retailers to provide PM with such advanta-

geous space, PM makes higher promotional payments to those retailers who choose to sign a Retail Leaders contract at a higher level of participation.

24. Under every level of Retail Leaders, PM obtains cigarette product space in an amount equal to or less than its market share; where PM's local market share exceeds 55%, PM requires only 90% of its share of product space.

25. The 1999 Retail Leaders program featured four category performance levels (CPLs) or levels of participation: CPL Base, CPL1, CPL2, and CPL3. At the higher levels of the 1999 Retail Leaders program (CPL2 and CPL3), PM not only made promotional payments to retailers, but PM also introduced the "industry fixture" in pack outlets. The industry fixture occupies a certain portion of the total display space for cigarettes (depending on the retailer's level of performance) and is ordinarily placed on the back bar behind a primary register. The industry fixture has a header portion which serves as a vehicle for equity and promotional signage.

26. At the mid-level of Retail Leaders, the industry fixture must occupy 50% of the total display space for the cigarette category. PM brands are required to be placed on the top half of the industry fixture loaded horizontally, assuming a PM market share of 50%. The remaining 50% of display space will ordinarily be divided into two additional fixtures. The first fixture, known as the PM "prime" fixture, will constitute approximately 25% of the overall space. Only PM brands and signage may be displayed on the prime fixture. The prime fixture must be placed in the second-best visibility location. The last fixture, known as the "retailer's choice" fixture, will occupy the remaining 25% of the category space. The retailer can display competing manufacturers' brands and signage in this location.

27. At the highest level of Retail Leaders, the industry fixture accounts for 100% of the category display space.

28. Defendant's merchandising program was first before the court in 1999, when the Plaintiffs sought a preliminary injunction prohibiting the Defendant from implementing Retail Leaders. Following extensive discovery and briefing, the court held a two-day evidentiary hearing on June 9 and 10, 1999. Because the court found that the balance of hardships tipped decidedly in the Plaintiffs' favor, the court found that it was unnecessary for the Plaintiffs to make a strong showing of likelihood of success, and it was sufficient to warrant injunctive relief that Plaintiffs raised serious and substantial questions concerning Defendant's market power and the anticompetitive effect of Retail Leaders.

29. In its June 29, 1999, order and preliminary injunction, the court limited what it had found to be Defendant's "unprecedented control" of Plaintiffs' signage on Plaintiffs' own portions of the industry fixture in CPL2 stores. The court also limited any requirement in CPL2 contracts that gave PM a percentage of permanent signage greater than its local market share or its share of the retailer's total cigarette sales.

30. In 2000 and 2001, PM modified Retail Leaders from its initial design. The 2000 Retail Leaders program consisted of five levels. CPL1 was grandfathered; Levels A and B corresponded to CPL Base; Level C corresponded to CPL2; and Levels D and E corresponded to CPL3. The 2001 Retail Leaders program has only three levels or category merchandising options (CMOs): CMO1, CMO2, and CMO3. CMO1 is the successor to CPL Base and Levels A and B; CMO2 is the successor to CPL2 and Level C; and CMO3 is the successor to CPL3 and Levels D and E.

31. Retail Leaders contracts are terminable at will without penalty upon thirty days' notice. Although termination of a Retail Leaders contract sometimes necessitates reconfiguration of displaced fixtures, it will not be very burdensome. Even when PM owns the fixtures in Retail Leaders stores, PM generally does not request the return of the fixtures when a retailer leaves the program or changes levels in the program. PM has never demanded that a retailer repay costs related to the installation of the fixture. Under normal practice in the cigarette industry reconfiguration is usually carried out by the manufacturer that benefits from the rearrangement.

32. In 2001, PM modified one of the restrictions that previously applied at the highest level of the Retail Leaders program (CMO3) by permitting competitors to place permanent equity signage in space on the industry fixture for which competitors contract. In addition, PM adopted a progressive merchandising option (PMO), which strengthened the incentives offered to retailers to adopt non-self-service merchandising of cigarette products. Professor Hay concedes that PM has legitimate business reasons and public relations concerns for wanting to eliminate self-service sales of tobacco. (Hay July 13, 2001, Dep. at 378–79, App. to Def.'s Mot. for Summ.J. at 849–50.)

33. On February 16, 2001, RJR filed a motion asking the court to enter an order directing PM to show cause why it should not be held in contempt of court for violating the court's order and preliminary injunction entered June 29, 1999. Shortly thereafter Lorillard, but not B & W, joined RJR's motion. Following a review of new evidence produced pursuant to the parties' ongoing discovery and after hearing oral argument on the issue, the court denied RJR and Lorillard's motion to issue a show-cause order on May 3, 2001.

34. Although PM does not demand a higher percentage of available product space than its market share, PM places restrictions on competitive signage in stores under Retail Leaders contracts. Despite these restrictions, Plaintiffs have several options to promote their products in stores under Retail Leaders contracts. In CMO3 stores, the highest level of Retail Leaders, Plaintiffs can (1) place permanent equity signs, including lighted signs, on their portion of the industry fixture; (2) place temporary or permanent price call-out signs anywhere in a CMO3 store;[4] (3) place equity signs anywhere in the store as long as they are taken down or moved to another location in the store after thirty days; (4) put an equity sign back up or return it to its original location after thirty days; and (5) alternate a price call-out sign and an equity sign in the same location every thirty days. In stores at the lower levels of Retail Leaders, Plaintiffs have more freedom with regard to signage.

35. In all Retail Leaders stores, retailers may: (1) merchandise and sell competitive products; (2) sell competitive products at any price; and (3) offer sales or promotions on competitive products for any length of time and at any price they choose.

36. On July 11, 2001, RJR filed a motion to modify the court's order and injunction of June 29, 1999. The court held a three-day hearing on RJR's motion on October 16–18, 2001, at which time it heard two days of testimony of witnesses and considered numerous exhibits and discovery materials. After hearing oral argument from RJR and PM, the court denied RJR's motion to modify the preliminary injunction on December 10, 2001.

### D. *Plaintiffs' Market Share Prior to Retail Leaders*

37. RJR's market share has been steadily declining for the past two decades as a result of many factors predating and wholly unrelated to Retail Leaders. RJR had approximately 33% of the market in 1981. RJR's share had dropped to approximately 23% of the market in 1999 before the introduction of Retail Leaders by PM.

38. Similar to RJR's market share, B & W's market share has been steadily declining for the past twenty years as a result of factors predating and wholly unrelated to Retail Leaders. B & W had a market share of 23.5% in 1981. B & W's market share began declining at that time and has dropped even more sharply since 1994. Prior to the introduction of Retail Leaders, B & W's market share dropped to approximately 13.4% in 1999.

39. Lorillard's share of the industry has remained relatively constant over the past two decades. Lorillard had approximately 9.1% and 10.7% of the market in 1981 and July 1999, respectively.

### E. *PM's Market Share Before and After Retail Leaders*

40. PM's market share has been steadily increasing for the past two decades. In 1981, PM had approximately 32% of the market, which increased steadily to about 49.6% in 1999. PM had approximately 51% of the market in 2001. MSA Shipment Data and Marlin Retail Take–Away Data indicate that since 1999 PM's market share increases have been smaller than their average rate of increase prior to Retail Leaders.[5] Based on M.S.A. § Ship-

---

4. Price call-out signs must convey a price message on 2/3 of the sign, and the remaining 1/3 of the sign may convey an equity message.

5. MSA Shipment Data and Marlin Take–Away Data are types of marketing data upon which the parties regularly rely. The parties also cite to IRI–Capstone Data.

ment Data, PM's annual average market share increase from 1989 to 1998 was 1.01%, as compared to 1.44% from 1994 to 1998. From 1998 to 2000, PM's annual average market share increase fell to 0.54%. Thus during the past two decades PM's highest growth occurred during the five years prior to Retail Leaders.

41. PM's market share is driven by the success of the Marlboro brand. RJR's Chief Executive Officer, Andrew Schindler, recognizes this and attributes Marlboro's success to "great positioning, great advertising, you know, a really good product." (Schindler March 27, 2001, Dep. at 40, App. to Def.'s Mot. for Summ.J. at 1000.)

42. PM has used and continues to use price discounting to maintain the competitive success of the Marlboro brand. In fact, R. Scott Keith, RJR Vice President of Business Strategy and Planning, characterized Marlboro smokers as "price aware" and indicated that "Philip Morris is responding accordingly by having discounting in the market place to get their price point where they believe it's necessary." (Keith October 25, 2000, Dep. at 87, App. to Def.'s Mot. for Summ.J. at 903.) Susan Ivey, the President and Chief Executive Officer of B & W, acknowledged that more money was devoted to price competition in 1999 than ever before, primarily due to PM offering more weeks of Marlboro discounts to its retailers on contract. (Ivey December 12, 2000, Dep. at 146–47.)

43. There is no evidence in the record to suggest that Marlboro smokers will not switch to a lower-priced brand if Marlboro is not priced competitively. In fact, when Marlboro's market share declined from over 26% in 1989 to approximately 24% in 1992, primarily as a result of competition from the discount segment, PM announced a price *reduction* of approximately 20% in April 1993, an event the parties refer to as "Marlboro Friday." Susan Ivey, the Pres-

ident and Chief Executive Officer of B & W, testified that PM's decision changed the pricing of the industry, pushing it downward. (Ivey December 13, 2000, Dep. at 258–59.)

44. Average retail prices of premium brands during the period from January 1, 1999, to August 25, 2001, are as follows (in order of decreasing prices): Newport $3.08; Salem $2.89; Kool $2.88; Camel (filters) $2.87; Marlboro $2.86; Winston $2.73.

45. The average prices of Marlboro relative to competitive brands are generally lower after Retail Leaders than they were before Retail Leaders.

46. Professor Hay offers no opinion as to whether Retail Leaders has resulted in PM charging higher prices. In fact, Professor Hay asserts that "any effect [of higher prices] would be likely to be felt no later than five or six years from now." (Hay July 12, 2001, Dep. at 108, App. to Def.'s Mot. for Summ.J. at 810.)

### F. *Retailer Participation in Retail Leaders*

47. Retailers often move from a high level of Retail Leaders to lower levels of Retail Leaders. Some retailers cease participating in Retail Leaders altogether. From December 1999 to July 2001:(1) more than 10,000 retailers ceased participating at the highest level of Retail Leaders, either by switching to a lower level or departing the program altogether; (2) more than 1,400 retailers at the highest level of Retail Leaders ceased participating in Retail Leaders altogether; and (3) more than 5,500 retailers at some level of Retail Leaders ceased participating in the program altogether. In the two years following the preliminary injunction, some retail stores have shifted away from the middle level of Retail Leaders (currently CMO2). On June 24, 1999, stores signed

to CMO2 (then CPL2) contracts accounted for 20.1% of PM's workload volume.[6] As of September 2001, stores signed to CMO2 contracts sold 15.8% of PM's workload volume.[7]

48. The percentage of CIV sold in stores at the highest level of Retail Leaders increased from 18% on June 1, 1999, to 34% in September 2001;[8] thus, as of September 2001, 66% of CIV was sold through stores without a CMO3 contract. On the whole, approximately 71% of CIV is sold in stores with some type of Retail Leaders contract.

49. Among the 200,000 stores in PM's "workload" (the stores that PM salespeople routinely visit), 63% have not signed a CMO3 contract. Between 44% and 55% of retailers that are eligible for and that have been offered CMO3 contracts have refused them. In fact, 7–Eleven, the nation's largest convenience store chain, participates in Retail Leaders at the lowest level and also has merchandising contracts with RJR and B & W. Moreover, only fourteen of the top 150 chains have CMO3 contracts and no other manufacturer on contract. (App. to Def.'s Mot. for Summ.J. at 107.)

50. Retailer participation at the highest level of Retail Leaders has risen due to increased promotional payments that PM makes to retailers at this level and also because of PM's removal of the prohibition on equity signage on the competitor's portion of the industry fixture in CMO3 stores. The effects of the increased promotional payments and the removal of the signage prohibition on retailer participation are illustrated by a comparison of Levels D and E from Retail Leaders 2000 to CMO3 Retail Leaders 2001. (Level D and CMO3 are virtually identical in key respects except that CMO3 includes significantly higher promotional payments to retailers. Level E is very similar to CMO3 except Level E prohibited competitors from placing equity signage on the industry fixture.) By the end of 2000, Level D retail stores accounted for only 1.7% of PM's workload volume; Level E accounted for 39.2% of PM's workload volume. Together, Levels D and E accounted for 40.9% of PM's workload volume. In 2001, CMO3 stores accounted for 51.5% of PM's workload volume. This represents a 10.6% increase in workload volume at the highest level of Retail Leaders.

6. Workload volume is a term that describes the volume of a manufacturer's total sales at stores that a manufacturer calls on regularly. Some of the sales data in the record before the court is presented as workload volume and other data are presented as cigarette industry volume (CIV). CIV figures are more appropriate for the present analysis because they reflect the relevant product and geographic markets—all retail cigarettes sold in the United States.

7. Plaintiffs failed to provide CIV figures for CMO2 stores. The figure Plaintiffs submitted to the court regarding CMO2 stores (15.8% of PM's workload volume) fails to reflect the relevant market in that it is based on PM's workload volume rather than CIV. Furthermore, this figure overstates the penetration of PM's CMO2 contracts. Using the 15.8% of PM's workload volume, in comparison with

CMO3 workload volume and CIV figures, yields a CMO2 CIV figure of approximately 10% to 11% [ (% of PM's workload volume at CMO3) ÷ (% of CIV at CMO3)=(% of PM's workload volume at CMO2) ÷ (% of CIV at CMO2) ]. Viewing these figures in the light most favorable to Plaintiffs and allowing a margin of error, the court will use 12% of CIV to represent PM's penetration of CMO2 contracts.

8. There is some dispute whether CMO3 stores represented 31% or 34% of CIV in September 2001. RJR data indicate that the appropriate percentage is 31%, while PM data indicate that CMO3 stores represented 34% CIV. Because all reasonable facts are viewed in favor of the non-moving party, the court will assume that 34% of CIV was sold in CMO3 stores in September 2001.

51. RJR's decision to promote in CMO3 stores also caused increased penetration of CMO3. When RJR initially reacted to Retail Leaders, RJR made a decision not to promote in stores at the highest level. RJR later retreated from this position of non-promotion in stores at the highest level of Retail Leaders. RJR decided to promote in stores at the highest level of Retail Leaders because of the large number of stores at the highest level and RJR's vulnerability in these stores, and because RJR believed it could get enough space to market and promote its products adequately. Professor Hay believes that the availability of RJR promotions in stores at the highest level of Retail Leaders significantly increased CMO3 penetration.

52. PM's decision to relax its restraints on competitors' permanent signage made CMO3 less restrictive, but increased its penetration because it allowed retailers to sign a contract with more than one manufacturer. Professor Hay believes that RJR's ability to put signage on the industry fixture benefits RJR, but also harms RJR because more retailers sign agreements at the highest level of Retail Leaders. (Hay July 13, 2001, Dep. at 324, App. to Def.'s Mot. for Summ.J. at 838.)

53. The primary factors driving retailers to sign PM contracts at the CMO3 level—removal of the prior permanent signage restraint on the industry fixture and increased discounts—benefit both Plaintiffs and consumers.

### G. *Plaintiffs' Merchandising Programs*

54. Despite the success of PM's Retail Leaders, RJR has achieved success with its own merchandising programs. From August 1999 to August 2001, the percentage of CIV sold in stores with an RJR contract increased from 64% to 71%, a figure which exceeded RJR's goal of 70% In addition, this figure demonstrates that the penetration of RJR's merchandising program is nearly identical to PM's penetration in that approximately 71% of CIV is sold in stores with some form of Retail Leaders contract. Bryan Stockdale, RJR Vice President of Trade and Marketing, stated the importance of one cigarette industry volume (CIV) point: "[O]ne CIV point for us is tremendous, relative to the kind of impact it can have on our business." (Stockdale October 16, 2001, Hearing Testimony at 57.) RJR has achieved this success despite spreading its promotional efforts across four separate brands, whereas PM concentrates its efforts primarily on Marlboro.

55. RJR also has been successful with its highest level merchandising contract, the Bonus contract. The percentage of CIV sold in stores with an RJR Bonus contract increased from 20% in August 1999 to 43% in August 2001; RJR's goal for 2001 was 24%. RJR believes that it is able to do an "extremely effective job" with advertising and display at stores where it has an RJR Bonus contract. (Stockdale October 16, 2001, Hearing Testimony at 29–30.) Stores signed to PM's CMO3 contracts account for 34% of CIV. Thus, at the present time, more cigarettes are sold through stores with an RJR Bonus contract than are sold through stores with a PM CMO3 contract.

56. Of the 34% of CIV sold by stores with a CMO3 contract, approximately one-half is sold by CMO3 stores that also have an RJR contract. RJR has also increased the number of CMO3 stores signed to RJR contracts. On April 29, 2001, RJR had a merchandising contract with 15,591 CMO3 stores, a number which increased to 22,223 CMO3 stores on September 13, 2001. Furthermore, in many of these CMO3 stores, RJR has more than its market share of highly visible space. Although RJR's national retail market share is 22%,

RJR's Bonus contracts require at least 35% of the highly visible display space.

57. Of the total number of cigarettes sold through pack outlets, the percentage of cigarettes sold in pack outlets on an RJR Bonus contract increased from 18% in August 1999 to 41% in August 2001; RJR's goal for 2001 was 18%.

58. Since 1999, the percentage of CIV sold in stores that RJR classifies as "PM exclusives" declined from 19% to 14% in August 2001.[9]

59. RJR has been particularly successful in signing cigarette and tobacco stores to merchandising contracts. Ninety per cent of all cigarettes sold through cigarette and tobacco stores is sold where RJR has a contract. Furthermore, of the total number of cigarettes sold solely through cigarette and tobacco stores, the percentage of cigarettes sold in cigarette and tobacco stores on an RJR Bonus contract increased from 34% in August 1999 to 73% in August 2001, which exceeded RJR's goal of 60% for 2001.

60. The Retail Leaders program is more likely to affect adversely B & W and Lorillard (rather than RJR) as they are more likely to be the "odd men out" at the point of purchase. Despite this, both B & W and Lorillard have been successful in signing retail stores to merchandising contracts following the implementation of Retail Leaders.

61. B & W has increased its penetration in stores on CMO3 contracts. On April 29, 2001, approximately 12% of CIV sold by CMO3 stores was sold through stores that also had a B & W merchandising contract. By September 13, 2001, the amount of CIV sold by CMO3 stores that also had B & W merchandising contracts had increased to approximately 19.4% of CIV.

62. Lorillard has its highest level contract in 7% more pack outlets after Retail Leaders than before Retail Leaders. As of December 1998, Lorillard signed 13,933 pack outlets to Lorillard's highest-level contract. As of December 2000, the last period for which Lorillard produced data, Lorillard had 14,954 pack outlets signed to its highest-level contract.

63. Lorillard also has its highest-level contract in 42% more cigarette and tobacco stores after Retail Leaders than before Retail Leaders. As of December 1998, Lorillard signed 2,970 cigarette and tobacco stores to Lorillard's highest-level contract. As of December 2000, the last period for which Lorillard produced data, Lorillard had 4,203 cigarette and tobacco stores signed to its highest-level contract.

64. Plaintiffs have other non-retail marketing opportunities to communicate with adult smokers. Lynn Beasley, RJR's Executive Vice President of Marketing, testified that RJR spends roughly $600 million, approximately three times what it spends on retail merchandising, on non-retail merchandising such as print advertising, direct mail, event promotions, spon-

9. RJR changed its definition of "PM exclusive" in January of 2001. RJR initially defined all stores signed to the highest level of Retail Leaders as "PM exclusive." However, when RJR began signing to its merchandising contracts stores at the highest level of Retail Leaders, RJR changed its definition to mean those stores that had only a PM contract. Because RJR did not initially attempt to sign to its merchandising contracts stores at the highest level of Retail Leaders, the change in definition did not account for a significant difference. In December 2000, before the definition change, 15% of CIV was sold in stores that RJR classified as "PM exclusives." Under RJR's new definition, January 2001 data showed that 13% of CIV was sold in stores that RJR classified as "PM exclusives." Regardless of RJR's definition change, the fact remains that the number of stores that RJR defines as "PM exclusive" has dropped since 1999.

sorship, sweepstakes, relationship programs, discount coupons, and continuity programs. (Beasley October 16, 2001, Hearing Testimony at 198–201.) Lorillard has increased its "direct consumer promotions" (which includes buydowns) since the implementation of Retail Leaders. Lorillard's direct consumer promotions rose from about $206 million in 1998 to about $396 million in 2000. B & W spent approximately $96.2 million in 2000 on direct mail discounting. Furthermore, in 2001, B & W initiated a $9 million direct marketing campaign, its largest in history, in support of its Pall Mall line extension.[10]

### H. *Plaintiffs' Market Share After the Implementation of Retail Leaders*

65. In the two years following the implementation of Retail Leaders, RJR's overall market share has decreased slightly. Based on M.S.A. § Shipment Data, RJR's overall market shares in 1998 and 1999 were 23.98% and 23.00%, respectively. From 1999 to the third quarter of 2001, RJR's market share slightly decreased from 23.00% to 22.35%. However, RJR's market share has increased from the first quarter of 2001 to the third quarter of 2001. The rate of decrease in RJR's market share over the past two years is consistent with the downward trend in RJR's overall market share over the past twenty years.

66. RJR has been particularly successful in cigarette and tobacco stores. As of June 30, 2001, RJR had a market share in cigarette and tobacco stores of 31.1%, compared to 33.9% for PM. From 2000 to June 30, 2001, RJR gained 3.0% market share in cigarette and tobacco stores, while PM lost 1.5%.

67. RJR's economic expert, Professor Hay, concedes that he cannot say that RJR would be performing better in the absence of Retail Leaders. In particular, Professor Hay admits that "had the Retail Leaders [p]rogram never been in existence," RJR may have had "a lower market share or a higher market share." (Hay July 12, 2001, Dep. at 59, App. to Def.'s Mot. for Summ.J. at 796.)

68. The combined market share of RJR's four investment brands (Winston, Camel, Salem, and Doral) improved in the first full year of data for Retail Leaders. Based on M.S.A. § Shipment Data, the combined market share of RJR's four investment brands grew by 0.16 share points from 1999 to 2000, in contrast to the long-term declines in combined market share of these four brands prior to Retail Leaders. Although the combined share of RJR's four investment brands decreased from 2000 to the third quarter of 2001 (based on M.S.A. § Shipment Data), RJR's market share for its four investment brands has shown an increase from the first quarter to the third quarter of 2001. According to Marlin Retail Take–Away Data, the combined market share of RJR's four investment brands has been relatively stable from 1999 to the third quarter of 2001 compared to the long-term decline in combined market share of these four brands prior to Retail Leaders.

69. Camel, in particular, has shown significant improvement in the market since the introduction of Retail Leaders. Camel's market share, excluding the non-filtered style, increased in 2000 and has continued to grow during the most recent quarter. In fact, based on IRI/Capstone Data, Camel's market share increased each year from 1997 to the third quarter of 2001. RJR has characterized Camel as "one of the fastest growing full-price

---

10. PM also places high importance on non-retail marketing activities. In 2000, PM spent

in excess of $600 million on these activities.

brands." (McGuire October 11, 2001, Dep. at 10, App. to Def.'s Mot. for Summ.J. at 923.)

70. In the two years following the implementation of Retail Leaders, B & W's market share continued to decline as it had before Retail Leaders. Based on M.S.A. § Shipment Data, B & W's overall market shares in 1998 and 1999 were 15.00% and 13.37%, respectively. From 1999 to the third quarter of 2001, B & W's market share decreased from 13.37% to 11.23%. However, B & W's market share increased from the first quarter of 2001 to the third quarter of 2001. The overall rate of decrease in B & W's market share over the past two years is consistent with the downward trend in B & W's overall market share over the past twenty years.

71. As reflected by the loss in GPC's market share, B & W's primary discount brand, over the past two years B & W has been especially hurt by the introduction of discount brands by AOMs. Furthermore, Susan Ivey of B & W stated that the effectiveness of GPC's discounting has been reduced because of price competition from premium brands. (Ivey December 12, 2000, Dep. at 154–56.) Based on IRI/Capstone Data, GPC's market shares in 1998 and 1999 were 5.18% and 4.38% respectively. GPC's market share, however, decreased to 2.89% in 2001.

72. Lorillard's market share peaked in late 1998 at approximately 10.7%. Lorillard's market share decreased to approximately 9.8% in September 2001. Despite Lorillard's overall decline in market share, Lorillard's key premium brand, Newport, has continued to grow since the implementation of Retail Leaders; however, Maverick and Old Gold, Lorillard's two discount brands, have lost market share since 1998, losses which correspond with the increase in market share of the AOMs' discount brands.

73. Newport has gained market share following the implementation of Retail Leaders. From 1994 to 1999, Newport grew between approximately 6% and 9% per year. Following implementation of Retail Leaders, Newport grew by approximately 2.5% in 2000 and approximately 5% as of September 2001. Thus, in every year since 1994, including the years in which Retail Leaders has existed, Newport has gained market share.

74. When Lorillard competes aggressively, it performs well. For example, Lorillard took an extremely aggressive posture with Maverick, and as a result of increased promotions Maverick's share jumped sharply from 0.76% in the fourth quarter of 1998 to 1.32% in the first quarter of 1999. Lorillard stated that " [Our competitors'] hesitation to meet these discounts enabled us to bring thousands of new customers on board." (Lorillard Internal E–Mail from Steven Enloe, March 26, 1999, App. to Def.'s Mot. for Summ.J. at 687.) As promotional values decreased and competitors began to match Maverick's discounts, market share fell back to 0.96% in the fourth quarter of 1999, which was still above the market share in the fourth quarter of 1998. As AOMs' market share increased from 1998 to 2001, Maverick continued to lose market share. In August 2001, Maverick had a market share of approximately 0.40%.

75. From the third quarter of 1998 to the third quarter of 2000, each Plaintiff lost market share in pack outlets signed to agreements at the highest level of Retail Leaders. RJR and B & W lost 5.14 and 3.11 share points, respectively, during this time period in pack outlets signed to agreements at the highest level of Retail Leaders. Lorillard lost only 0.36 share points during this time period in pack outlets signed to agreements at the highest level of Retail Leaders. During the same

period AOMs gained almost two full share points in the same pack outlets.

76. The aggregate market share of deep-discount brands has grown significantly since 1998 when the four major cigarette manufacturers entered into the Master Settlement Agreement. In fact, AOMs' market share has increased at every level of Retail Leaders, even in stores at the highest level. None of PM's brands is a deep-discount brand. Since 1998 AOM growth has outpaced all major manufacturers, including PM.

77. Since the introduction of Retail Leaders, RJR has launched new products that both RJR and PM describe as successful. For example, R. Scott Keith, RJR Vice President of Business Strategy and Planning, stated that RJR was able to introduce successfully Camel Turkish Gold, notwithstanding the existence of Retail Leaders. (Keith September 14, 2000, Dep. at 35–36, App. to Def.'s Mot. for Summ.J. at 899.) RJR's marketing expert, Robert Blattberg, stated that a new product is getting good distribution if it has 75% distribution six months after introduction. (Blattberg July 6, 2001, Dep. at 379, App. to Def.'s Mot. for Summ.J. at 742.) Camel Turkish Gold, introduced in 2000, is available in stores where over 85% of all cigarettes are sold. Winston S2, two months after introduction, was available in stores where over 72% of all cigarettes were sold.

I. *Plaintiffs' Revenues and Profits*

78. RJR's revenues, profits, and cash reserves have increased since the introduction of Retail Leaders.

79. The decline in B & W's revenues prior to Retail Leaders has continued since the implementation of Retail Leaders. B & W decided to focus its marketing efforts on Kool and has acknowledged that some of its brands are "doomed to decline anyway." Robert Bexon, B & W's Senior Vice President of Marketing and Sales, stated, "Nobody was going to make a case to invest a lot of resources in Pall Mall." "I don't think there is much you could or would do with Tareyton." "It had no market position, it had no relevance, and the resources you would invest in doing something with it would be resources you would be unable to invest in something else." (Bexon January 25, 2001, Dep. at 189–91.)

80. Since the implementation of Retail Leaders, Lorillard has exceeded its profit goals, so much so that in 1999 and 2000 Lorillard earned record profits.

J. *Discounting After the Implementation of Retail Leaders*

81. Higher levels of discounting exist since the introduction of Retail Leaders. RJR responded to Retail Leaders with a $40 million incentive program. RJR has characterized its discounting as defensive in nature, responding to whatever its competitors (mainly PM) do. Since Retail Leaders was introduced, RJR, Lorillard, B & W, and PM have increased promotions, discounts, and merchandising payments to retailers. There are generally higher levels of discounting since PM's introduction of Retail Leaders as compared to the period prior to Retail Leaders.

82. PM's, RJR's, Lorillard's, and B & W's retail and direct price promotions and merchandising expenditures have increased 87%, 54%, 72%, and 27%, respectively, since the implementation of Retail Leaders.

## DISCUSSION

A. *Plaintiffs' Federal Claims*

Plaintiffs characterize the limitations on competitive advertising in Retail Leaders stores as "substantial interbrand restrictions on the flow of consumer information critical to the proper functioning of a free-

enterprise system." (Pls.' Mem. in Opp'n to Def.'s Mot. for Summ.J. at 2.) Plaintiffs contend that these restrictions limit competitors' incentives and abilities to promote their products resulting in higher prices for non-PM brands in Retail Leaders stores and thus lower consumer welfare. Plaintiffs therefore contend that Retail Leaders violates Sections 1 and 2 of the Sherman Act.

### 1. Section 1 of the Sherman Act

Plaintiffs contend that PM's Retail Leaders program constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act. Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. Courts have interpreted this broad language to proscribe only those restraints found to be unreasonable. *Advanced Health–Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 144 (4th Cir.1990).

■ PM's Retail Leaders program is a non-price vertical restraint; thus the court must apply Rule of Reason analysis in determining the reasonableness of Retail Leaders. *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 735–36, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 59, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The Supreme Court has indicated that "the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." *National Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). Such an inquiry requires the fact finder to "weigh[ ] all of the circumstances of a case in deciding whether a restrictive practice should be prohibit-

ed as imposing an unreasonable restraint on competition." *Continental T.V.*, 433 U.S. at 49, 97 S.Ct. 2549.

■ A proper Rule of Reason inquiry involves three steps. First, Plaintiffs must carry the initial burden of showing that the challenged conduct has "an *actual* adverse effect on competition as a whole in the relevant market." *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir.1995) (quotation omitted). Second, if Plaintiffs succeed in meeting their burden, "the burden shifts to [PM] to establish the pro-competitive redeeming virtues of the action." *Id.* (quotation omitted). If PM sustains that burden, Plaintiffs can still prevail by showing "that the same pro-competitive effect could be achieved through an alternative means that is less restrictive of competition." *Id.* (quotation and citations omitted).

■ Before beginning this three-step inquiry, the court must make a preliminary inquiry into whether PM has market power. The Fourth Circuit has said that "[a] threshold inquiry in any Rule of Reason case is whether the defendant had market power" in the relevant product and geographic markets. *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir.1989) (quotation and citations omitted). The reason for this threshold inquiry is that " '[f]irms lacking market power, if they wish to survive, cannot adopt restraints that have anticompetitive effects. Thus such firms cannot have an effect on interbrand competition. Consequently, a finding of no market power precludes any need to further balance the competitive effects of a challenged restraint.' " *Id.* at 529 (quoting *Assam Drug Co. v. Miller Brewing Co.*, 798 F.2d 311, 316 (8th Cir. 1986)).

### a. *Market Power*

■ Market power is the ability to raise prices above the levels that would be charged in a competitive market. *NCAA v. Board of Regents of the Univ. of Okla.*, 468 U.S. 85, 109 n. 38, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Professor Areeda explains that, for antitrust purposes, "market power is the ability (1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion." IIA Phillip E. Areeda, Herbert Hovenkamp, & John L. Solow, *Antitrust Law* ¶ 501 (1995).

■ In order to provide direct proof of market power, Plaintiffs must "put[] forth evidence of restricted output and supracompetitive prices." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.1995) (citing *Federal Trade Comm'n v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986)). As an attempt to prove directly that PM possesses market power, Plaintiffs point to Retail Leaders itself. Plaintiffs contend that Retail Leaders itself is evidence of market power because no other manufacturer could get retailers to agree to a merchandising program with such favorable terms.

Plaintiffs, however, compete for the same merchandising space as does PM, and Plaintiffs are often successful in signing retailers to merchandising contracts with favorable terms. For example, RJR's highest level merchandising contract, the Bonus contract, requires a retailer to give RJR more than its market share of what RJR terms "highly visible" space. Furthermore, RJR has achieved more success with its highest level contract (43% CIV on Bonus contracts) than PM has with its highest level contract (34% CIV on CMO3 contracts) in terms of market penetration. Lorillard and B & W also have achieved successes in their merchandising programs during Retail Leaders.[11] Plaintiffs' successes in merchandising disprove the contention that Retail Leaders is itself evidence of market power.

Market share data of the parties before and during Retail Leaders also weigh against the contention that Retail Leaders is itself evidence of market power. RJR's and B & W's respective market shares have been declining steadily for the past two decades as a result of many factors pre-dating and wholly unrelated to Retail Leaders. Any share losses by Plaintiffs during Retail Leaders are not inconsistent with their pre-Retail Leaders trend. Furthermore, PM's market share increases during Retail Leaders have been smaller than their average rate of increase prior to Retail Leaders. These market share data demonstrate that Retail Leaders has done nothing to alter the pre-Retail Leaders market landscape, and they undermine the contention that Retail Leaders is itself evidence of market power.

PM's consistently strong market share is driven by the success of the Marlboro brand. RJR's Chief Executive Officer, Andrew Schindler, recognizes this and attributes Marlboro's success to "great positioning, great advertising, you know, a really good product." (Schindler March 27,

---

11. Lorillard has its highest level contract in 7% more pack outlets after Retail Leaders than before Retail Leaders. Lorillard also has its highest level contract in 42% more cigarette and tobacco stores after Retail Leaders than before Retail Leaders.

During 2001, B & W has increased its penetration in stores on CMO3 contracts. On April 29, 2001, approximately 12% of CIV sold by CMO3 stores was also sold through stores with a B & W merchandising contract. On September 13, 2001, B & W had a contract with CMO3 stores representing approximately 19.4% of CIV.

2001, Dep. at 40, App. to Def.'s Mot. for Summ.J. at 1000.) In addition, the success of each party with respect to merchandising is the result of responses to the demands of consumers in the market. Retailers must be able to supply what their customers demand.

RJR states that it makes concessions to retailers in order to avoid losing merchandising agreements. B & W likewise states that it often modifies its merchandising strategy to retain contract coverage. In that same vein, PM relaxed the restrictions on competitive signage and increased promotional payments to retailers in CMO3 stores in 2001. As a result, PM achieved greater penetration with its CMO3 contracts. This type of activity, in which all parties here are engaged, constitutes competition at the pre-contract stage, and it weighs against PM having market power.

Furthermore, Plaintiffs have failed to prove the existence of supracompetitive prices. Although Plaintiffs contend that PM's list prices are artificially high (above that necessary to compensate for PM's obligations under the Master Settlement Agreement), Plaintiffs have failed to provide any evidence that PM's prices are supracompetitive. Plaintiffs state simply that PM's prices are higher than necessary and conclude that PM prices must be too

high. However, Plaintiffs' prices are comparable to and often higher than PM's.[12] Moreover, the average relative prices of PM's Marlboro brand (as compared with competitive brands) are generally lower in time periods after Retail Leaders than they were before Retail Leaders.[13] Furthermore, RJR's economic expert, Professor Hay, testified that he has "not reached any opinion to the effect that Retail Leaders has to this date resulted in [PM] charging higher prices during this period than they otherwise would have charged." (Hay July 12, 2001, Dep. at 99, App. to Def.'s Mot. for Summ.J. at 806.) When PM priced its Marlboro brand too high and began to lose market share, it was forced to roll back its prices—exactly what is supposed to happen when a manufacturer without market power tries to price above competitive levels.

Supracompetitive pricing requires a restriction in output. *Brooke Group,* 509 U.S. at 233, 113 S.Ct. 2578. With the market for retail cigarette sales diminishing as cigarette consumption declines, substantial excess capacity undercuts the possibility of restrictive output.

■ Because Plaintiffs cannot prove directly that PM has market power, Plaintiffs must attempt to do so circumstantially. "To demonstrate market power circumstantially, [Plaintiffs] must: (1) de-

---

**12.** Average retail prices of premium brands during the period from January 1, 1999, to August 25, 2001, are as follows (in order of decreasing prices): Newport $3.08; Salem $2.89; Kool $2.88; Camel (filters) $2.87; Marlboro $2.86; Winston $2.73.

**13.** Plaintiffs attempt to explain away the fact that their prices are at the same level as (and sometimes higher than) PM's prices by relying upon expert opinions that Retail Leaders reduces Plaintiffs' incentives to promote and discount their brands. *See, e.g.,* Warren–Boulton Nov. 28, 2001, Decl. in Supp. of Pls.' Mem. in Opp'n to Def.'s Mot. for Summ.J. at 7–8 (alleging that Retail Leaders reduces

"[P]laintiffs, incentives to promote aggressively" and arguing that such a reduction "plausibly explain[s] why [P]laintiffs' retail prices might be higher than PM's"). Plaintiffs' argument and the speculation of Plaintiffs' experts on this point are undercut by record evidence demonstrating that since Retail Leaders was introduced, RJR, Lorillard, and B & W, along with PM, have actually increased promotions, discounts, and merchandising payments to retailers. Thus, Plaintiffs' expert opinions on this point are entitled to little weight. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).

fine the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil*, 51 F.3d at 1434 (citations omitted).

The burden rests with Plaintiffs to identify the relevant product and geographic markets, *Satellite Television & Associated Res., Inc. v. Continental Cablevision of Va., Inc.*, 714 F.2d 351, 355 (4th Cir.1983) (citation omitted), based upon evidence of interchangeability of use and manufacture, that is, on evidence of cross-elasticities of supply and demand. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). However, it is undisputed that the relevant product market for the purpose of this litigation is all cigarette sales through retail outlets and that the relevant geographic market is the United States.

Not only are the relevant markets undisputed, but the fact that PM owns a dominant share of the market is undisputed. In August 2001, PM reported that approximately 51.3% of retail cigarette sales within the United States were of PM brands. In addition, PM's Marlboro brand holds approximately 38% of the market. Plaintiffs rely heavily on PM's large market share in support of their contention that PM has market power; however,

> [a] mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out [an anticompetitive pricing] scheme. The plaintiff must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the [defendant's] high price.

*Rebel Oil*, 51 F.3d at 1439 (citing *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1232 (8th Cir.1987)); *see also* IIA Areeda et al., *Antitrust Law* ¶ 532 (explaining the possibility of a "monopolist" without market power and citing *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422 (9th Cir.1993), a case in which the Ninth Circuit found that a firm with 100% market share did not possess the power to control prices or exclude competition). Thus, the determination of whether PM possesses market power in the relevant market boils down to whether Plaintiffs can "show that there are significant barriers to entry *and* show that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil*, 51 F.3d at 1434 (emphasis added) (citations omitted).

Plaintiffs contend that high entry barriers exist in the cigarette industry. Plaintiffs argue that existing brands' long-established brand equity and high brand loyalty, as well as prohibitions on certain types of advertising,[14] constitute high entry barriers. Plaintiffs cite the high concentration in the cigarette industry as evidence of these alleged high barriers to entry.

While historically the cigarette industry has been highly concentrated, the recent rapid expansion of new entrants into the retail cigarette market weighs against the existence of continuing high entry barriers. "Unrebutted evidence that actual competitors have entered the market is a strong indicator that [the defendant] lacks market power." *Anti–Monopoly, Inc. v. Hasbro, Inc.*, 958 F.Supp. 895, 904 (S.D.N.Y.1997) (citation omitted). Industry-wide price increases due in part to manufacturers' obligations under the Master Settlement Agreement have facilitated the entry of

---

14. For example, federal law prohibits cigarette advertising on television and radio. 15 U.S.C. § 1335. Also, the Master Settlement Agreement prohibits cigarette advertising on billboards.

many new competitors. The new entrants' share of the market has increased significantly, rising from only 0.6% of the market in 1996 to 4.1% in 2001, with most of this increase occurring after 1998. Even Plaintiffs characterize a one per cent share as substantial.

Plaintiffs argue that the Master Settlement Agreement, which includes provisions that limit the cost advantages held by AOMs and new entrants, restricts the growth potential of smaller competitors and potential competitors, thereby operating as a barrier to any further significant entry into the market. However, recent market share data do not demonstrate any decline in the expansion of AOMs, including new entrants. Whether the Master Settlement Agreement, which has facilitated entry into the market, will ultimately constitute a barrier to further significant entry is uncertain.

Even if potential barriers to entry remain, the undisputed substantial excess capacity in the market necessitates a finding that PM does not possess market power. Overall cigarette consumption in the United States is declining. As a result, Plaintiffs possess substantial excess capacity that would enable them to expand supply in order to meet any unsatisfied market demand. Plaintiffs admit to having the capacity to increase production by a rate between 15% and 30%. (Expert Report of Kenneth G. Elzinga, July 31, 2001, in Supp. of Def.'s Opp'n to RJR's Mot. to Modify the Prelim.Inj. at 23–24 (citing Pls.' Resps. to Def.'s Second Set of Interrogs.).) These market characteristics weigh heavily in favor of a finding that PM does not possess market power because declining demand and excess capacity "tend to break down patterns of [unlawful] pricing and produce price competition." *Brooke Group*, 509 U.S. at 238, 113 S.Ct. 2578.

Furthermore, Plaintiffs already possess established channels of distribution. This fact makes substantial excess capacity more important to the market power analysis than the existence or non-existence of entry barriers. This is so because existing competitors with substantial excess capacity and established channels of distribution with which to move the excess capacity to market need much less time to meet unsatisfied demand than do potential competitors who have neither pre-existing capacity nor channels of distribution. *Rebel Oil*, 51 F.3d at 1441 ("[I]f rivals have idle plants and can quickly respond to any predator's attempt to raise prices above competitive levels, the predator will suffer an immediate loss of market share to competitors.").

RJR's economic expert, Professor Hay, argues that the cigarette industry is characterized by a high degree of product differentiation that undercuts the significance of Plaintiffs' substantial excess capacity. Professor Hay admits that "excess capacity is likely to be a serious antidote to the exercise of market power" in markets "in which the product involved is substantially fungible." (Hay November 28, 2001, Decl. in Supp. of Pls.' Opp'n to Def.'s Mot. for Summ.J. at 7 n. 7.) Thus, Professor Hay's argument that product differentiation undercuts the significance of Plaintiffs' substantial excess capacity can mean only that he believes competitive brands of cigarettes to be insubstantially fungible.

Professor Hay's opinion with regard to product differentiation ignores the fact that the relevant market is *all* retail cigarette sales in the United States.[15] Fur-

---

15. Professor Hay attempts to demonstrate the extent of product differentiation in the retail cigarette market by pointing out the disparity in pricing between Marlboro (a premium brand) and Malibu (a deep-discount brand).

Professor Hay claims that Marlboro's 44% higher price than Malibu in the fourth quarter of 2000 is inconsistent with a fungible product industry. However, Professor Hay seems

thermore, Professor Hay's position stands in contradiction to Plaintiffs' testimony as well as to the actual realities of the market. RJR has stated that "price competitiveness is the overwhelming dynamic affecting marketplace performance for *all* key brands, except Newport." (Dep.Ex. 1150 at 8993, App. to Def.'s Mot. for Summ.J. at 564.) RJR's Vice President of Business Strategy and Planning testified that Marlboro smokers are "price aware" and that when brands are not priced competitively they "do lose share, Marlboro included." (Keith October 25, 2000, Dep. at 86, 88, App. to Def.'s Mot. for Summ.J. at 903–04.)

Market research by the parties demonstrates that many adult smokers do switch brands. At the time this litigation began, the parties reported that approximately 14% of adult smokers switched brands in the preceding two years. In fact, it is competition for these "switchers" that drives promotions in pack outlets where adult smokers are most likely to purchase non-usual brands. Thus, the presence of such a substantial number of "switchers" in the market (as well as Plaintiffs' actions in competing for these "switchers") further undermines Professor Hay's opinion regarding product differentiation.

Because Professor Hay's opinion is contradicted by Plaintiffs' own evidence and the record facts about the realities of the

market, "it cannot support a jury's verdict." *Brooke Group*, 509 U.S. at 242, 113 S.Ct. 2578. According to the Supreme Court, "[e]xpert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them. As we observed in *Matsushita*, 'expert opinion evidence ... has little probative value in comparison with the economic factors that may dictate a particular conclusion.'" *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594, n. 19, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

B & W's economic expert, Dr. Frederick Warren–Boulton, also tries to undermine the significance of Plaintiffs' substantial excess capacity. Dr. Warren–Boulton opines that the supply of "premium communication space" is "not highly elastic," thereby reducing the constraining effect of Plaintiffs' substantial excess capacity on PM's market power. Essentially, Dr. Warren–Boulton believes that Plaintiffs' substantial excess capacity is irrelevant to the market power calculus because Plaintiffs could not sell this excess capacity due to Retail Leaders' limits on an already limited amount of premium communication space. Dr. Warren–Boulton's opinion, however, ignores the record evidence demonstrating that Plaintiffs do have the ability to sell their products despite the presence of Retail Leaders and do have the ability to sell their excess capacity in the event that supracompetitive pricing leads to unsatisfied market demand.[16]

to ignore the fact that, as indicated by the relevant market, all cigarettes compete with all other cigarettes, a fact clearly supported by the record. Professor Hay's position on this point is quite similar to the largely discredited theory of submarkets. *See* IIA Phillip E. Areeda, Herbert Hovenkamp, & John L. Solow, *Antitrust Law* ¶ 533e (1995) (characterizing submarket theory as "a confusing diversion from the key question whether rival producers ... constrain a defendant's power" and stating that the degree of power inherent in differentiated products is almost uniformly insufficient to make each brand a separate market). Furthermore, in an earlier case in

this district the parties, which included B & W, agreed that the relevant market for antitrust claims involving the cigarette industry was all cigarette sales in the United States. *Liggett Group, Inc. v. Brown & Williamson Tobacco Corp.*, 748 F.Supp. 344 (M.D.N.C. 1990), aff'd, 964 F.2d 335 (4th Cir.1992), aff'd sub nom. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).

**16.** Because Plaintiffs have the ability to communicate with consumers in order to sell their products, Plaintiffs' substantial excess capacity acts as a guard against any possible

Despite the fact that in-store communication space is somewhat limited, all three Plaintiffs have achieved at least some success in their merchandising programs. Lorillard has its highest level contract in more stores now than before Retail Leaders. In 2001, B & W increased the penetration of its highest level contract in CMO3 stores. RJR has achieved greater market penetration with its highest level merchandising contract than PM has with its highest level merchandising contract. RJR's market penetration data are significant, especially considering the fact that with its highest level merchandising contract RJR obtains more than its market share of highly visible display space. Moreover, during Retail Leaders RJR has launched new products that it describes as successful. (Keith September 14, 2000, Dep. at 36, App. to Def.'s Mot. for Summ.J. at 899 (RJR's Vice President of Business Strategy and Planning describing the successful launch of Camel Turkish Gold).) In addition, Plaintiffs as well as PM can (and do) communicate with adult smokers via other media.[17] Contrary to Dr. Warren–Boulton's opinion, the undisputed facts demonstrate that Plaintiffs have the ability to communicate with adult smokers via in-store merchandising contracts as well as other media. Plaintiffs, therefore, have the ability to sell their excess capacity in order to correct any attempt by PM to engage in supracompetitive pricing. Thus, PM does not possess "the ability (1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion." IIA Areeda *et al.*, *Antitrust Law* ¶ 501 (defining market power "[f]or antitrust purposes"). In other words, PM does not possess market power. Because Dr. Warren–Boulton's opinion indicating otherwise is unsupported by the facts, it cannot support Plaintiffs' position concerning market power. *Brooke Group*, 509 U.S. at 242, 113 S.Ct. 2578.

In sum, Plaintiffs can point to no record evidence that demonstrates that PM has market power. In fact, Plaintiffs' substantial excess capacity completely undercuts the possibility that PM possesses market power. Opinions of Plaintiffs' experts indicating otherwise are unsupported by the record, and for that reason cannot support a jury verdict finding that PM possesses market power.

> Because a showing of market power is a threshold requirement to challenging a vertical non-price restraint, a defendant who establishes, in accordance with the rules governing summary judgment, that it lacks market power a fortiori establishes that no genuine issue of material fact exists and is entitled to entry of judgment in its favor as a matter of law.

*Assam Drug*, 798 F.2d at 317 (citing Fed. R.Civ.P. 56(c)).

b. *Adverse Effects and Substantial Foreclosure*

■ Assuming *arguendo* that PM has market power, Plaintiffs must also show

---

attempt by PM to engage in supracompetitive pricing. If pricing were at supracompetitive levels, resulting in unsatisfied market demand, Plaintiffs could inject their substantial excess capacity into the market at competitive prices in order to correct the supracompetitive pricing. The fact that Plaintiffs currently possess substantial excess capacity that they are not injecting into the market demonstrates that there exists neither supracompetitive pricing nor unsatisfied market demand resulting therefrom in need of correction.

17. In 2000, PM spent in excess of $600 million on non-retail marketing activities. RJR spent approximately $600 million in 2000 on these activities. Lorillard spent $396 million in 2000 on direct consumer promotions (which includes buydowns), and, in 2000, B & W spent approximately $96.2 million on non-retail marketing activities.

that Retail Leaders substantially forecloses competition in the relevant market. Citing a line of cases involving horizontal restraints and restrictions on the flow of information, *see, e.g., Federal Trade Comm'n v. Indiana Fed'n of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), Plaintiffs contend that the restraints of the type imposed by Retail Leaders are anticompetitive even without proof of higher prices or reduced output. Each of the cases relied on by Plaintiffs, however, involve a horizontal restraint, which is illegal *per se.* In cases involving horizontal restraints, anticompetitive effects are presumed without further proof. On the other hand, in cases involving vertical non-price restraints, such as Retail Leaders, anticompetitive effects must be proven. Therefore, the court must determine whether Retail Leaders results in any adverse effects on competition.

 Exclusive dealing arrangements are vertical restraints that involve an agreement prohibiting a retailer from distributing goods and services of a competitive supplier. These types of arrangements typically involve requirements contracts, non-competition clauses, and agreements giving discounts in exchange for exclusivity. Courts analyze exclusive dealing arrangements under the Rule of Reason. To prevail on an exclusive dealing claim, a plaintiff must begin by showing that the challenged conduct "forecloses competition in a substantial share of the line of commerce involved." *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 329, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

Although substantial foreclosure is required in all exclusive dealing cases, courts generally require plaintiffs to show substantial foreclosure in vertical restraint cases involving Rule of Reason analysis.

*See, e.g., Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1059 (8th Cir.2000), *cert. denied,* 531 U.S. 979, 121 S.Ct. 428, 148 L.Ed.2d 436 (2000) (applying substantial foreclosure test to manufacturer's discount programs tied to volume purchases); *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 236–37 (1st Cir.1983) (applying substantial foreclosure test to partial requirements contract). Furthermore, antitrust law regularly applies substantial foreclosure analysis to challenges to advertising programs. *E.g., Louisa Coca–Cola Bottling Co. v. Pepsi–Cola Metro. Bottling Co.,* 94 F.Supp.2d 804, 816 (E.D.Ky.1999) (applying substantial foreclosure analysis to retailer's agreement to advertise only defendant's brands); *Beverage Mgmt., Inc. v. Coca–Cola Bottling Corp.,* 653 F.Supp. 1144, 1153–54 (S.D.Ohio 1986) (applying substantial foreclosure analysis to supermarket's agreement to run only defendant's advertisements).

 In the present case, Plaintiffs challenge only PM's Retail Leaders program. Retail Leaders agreements are not exclusive dealing arrangements. In an exclusive dealing contract, the retailer is forbidden from carrying any competing products or posting any competitive signs. Retail Leaders agreements, in contrast, do not preclude the display of competing products, do not control the prices at which those products are offered, and do not provide Defendant with more than its market share of product space. Because Retail Leaders is less restrictive than an exclusive dealing arrangement, it arguably should face less scrutiny under antitrust analysis.[18] Nevertheless, the court will use the substantial foreclosure analysis typically used in exclusive dealing cases. There can be no adverse effect if competition is not foreclosed from a substantial

18. "Plaintiffs contend that Retail Leaders should face a higher level of scrutiny under antitrust analysis but offer no legitimate reason for such heightened scrutiny".

portion of the relevant market. Thus, Plaintiffs must show that Retail Leaders forecloses competition in a substantial share of the relevant market.

■ Under this type of analysis, the relevant product and geographic markets must first be determined because "the threatened foreclosure of competition must be in relation to the market affected." *Tampa Elec.*, 365 U.S. at 327, 81 S.Ct. 623. Next, "the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market." *Id.* at 328, 81 S.Ct. 623. Thus, a "plaintiff must show that competing manufacturers are excluded from a substantial share of the relevant market because that share of the market is controlled by" the vertical restraint at issue. *Chuck's Feed & Seed Co., Inc. v. Ralston Purina Co.*, 810 F.2d 1289, 1293 (4th Cir.1987). The relevant product market for the purpose of this litigation is all cigarette sales through retail outlets. The relevant geographic market is the United States.

Plaintiffs claim that they are foreclosed from the market for effective retail merchandising opportunities. Although any advertising or product placement restrictions associated with Retail Leaders are relevant to the foreclosure analysis because they can potentially affect the retail sale of cigarettes in the United States, it is also relevant that PM's competitors can advertise and sell their products in all Retail Leaders stores.

At each level of Retail Leaders, competitors have unlimited opportunities to sell and price promote and have substantial opportunities to advertise. Retail Leaders agreements place no restrictions on the price at which competitive products are sold. At all levels and during all versions of Retail Leaders, retailers have been free to carry as many competing brands as they choose. Under every level of Retail Leaders, PM obtains cigarette product space in an amount equal to or less than its market share; where PM's local share exceeds 55%, PM requires only 90% of its share of product space.

■ A plaintiff makes out a *prima facie* case of substantial foreclosure by demonstrating first that a significant percentage of the relevant market is foreclosed by the provision challenged. "The share of the market foreclosed is important because, for the contract to have an adverse effect upon competition, 'the opportunities for other traders to enter into or remain in that market must be significantly limited.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C.Cir.2001), *cert. denied*, ⸺ U.S. ⸺, 122 S.Ct. 350, 151 L.Ed.2d 264 (2001) (quoting *Tampa Elec.*, 365 U.S. at 328, 81 S.Ct. 623).

Courts have not established a firm percentage of market foreclosure that constitutes substantial foreclosure. Professor Hovenkamp suggests 20% as an appropriate minimum foreclosure percentage and 50% as a level at which courts routinely condemn foreclosure. *See* XI Herbert Hovenkamp, *Antitrust Law* ¶ 1821c (1998). Courts have condemned provisions involving foreclosure as low as 24% while provisions involving foreclosure as high as 50% have been upheld. *Compare Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1301, 1304 (9th Cir.1982) (24% foreclosure unlawful where contracts were long-term) *with Barry Wright*, 724 F.2d at 237–38 (50% foreclosure lawful where requirements contract had limited anticompetitive effect) *and Sewell Plastics, Inc. v. Coca–Cola Co.*, 720 F.Supp. 1196, 1213, 1218–20 (W.D.N.C. 1989) (40% foreclosure lawful where no anticompetitive harm shown), *aff'd in part*, 912 F.2d 463, 1990 WL 126148 (4th Cir. 1990).

■ Unless the foreclosure percentage is so high as to be presumed substantial,

the plaintiff must demonstrate substantiality through an analysis of the nature of the market. *Tampa Elec.*, 365 U.S. at 329, 81 S.Ct. 623. Thus, to determine substantiality in a given case, in addition to the foreclosure percentage, courts, including this court, *see Bepco, Inc. v. Allied–Signal, Inc.*, 106 F.Supp.2d 814, 827–28 (M.D.N.C. 2000), consider the duration of the agreement, the ability of consumers to comparison shop, and their propensity to switch products, the existence of barriers to entry, and the availability of alternative channels of distribution. *See Ryko Mfg.*, 823 F.2d at 1233–34; *see also* XI Hovenkamp, *Antitrust Law* ¶ 1821d. The lower the foreclosure percentage, the more salient these factors become in determining whether there has been substantial foreclosure.

The parties have proposed three possible foreclosure rates: CIV sold in CMO2 and CMO3 stores; CIV sold in CMO3 stores; and CIV sold in "PM exclusive" stores.[19] The CIV sold in CMO2 and CMO3, CMO3, and "PM exclusive" stores are: 46%, 34%, and 14%, respectively.

Plaintiffs are not foreclosed from displaying or promoting their products in CMO2 stores. In CMO2 stores, Plaintiffs have an opportunity to display and promote their products on the industry fixture and the retailer's choice fixture. The retailer's choice fixture is significant because it gives each Plaintiff an opportunity to display and promote its products in a highly visible display space. PM's competitors may place permanent equity signs on both the industry fixture and throughout any CMO2 store; PM seeks only a proportionate amount of signage. Plaintiffs have additional opportunities to promote their

products in CMO2 stores. Plaintiffs can: (1) place temporary or permanent price call-out signs anywhere in CMO2 stores; (2) place equity signs anywhere in the store as long as they are taken down or moved to another location in the store after thirty days; (3) put an equity sign back up, or return it to its original location, after thirty days; and (4) alternate a price call-out sign and an equity sign in the same location every thirty days. Thus, Plaintiffs are not foreclosed from CMO2 stores, and therefore the court will not use CIV sold in CMO2 stores in the foreclosure analysis.

Unlike CMO2 agreements, PM is entitled to exclusive permanent equity signage off the industry fixture under CMO3 agreements. Plaintiffs, however, have numerous other temporary and permanent communication opportunities. Plaintiffs are able to: (1) place permanent equity signage on their portion of the industry fixture; (2) are entitled to temporary signage in and out of the store; (3) can maintain that signage beyond thirty days by changing its location; and (4) may place price call-outs of any size, in any number, and for any duration.

From the third quarter of 1998 to the third quarter of 2000, each Plaintiff lost market share in pack outlets signed to agreements at the highest level of Retail Leaders. RJR and B & W lost 5.14 and 3.11 share points, respectively, during this time period in pack outlets signed to agreements at the highest level of Retail Leaders. Lorillard lost only 0.36 share points during this time period in pack outlets signed to agreements at the highest level of Retail Leaders. At the same time

---

**19.** Plaintiffs argue that workload volume is the proper figure to consider for foreclosure rates because stores that PM does not call on are essentially beyond reach because it is not cost effective to call on them. CIV figures, however, are more appropriate for the foreclosure analysis because they reflect the relevant product and geographic markets—all retail cigarettes sold in the United States.

AOMs gained almost two full share points in these same pack outlets. Although each Plaintiff lost market share in these stores during this time period, this in itself is not evidence of anticompetitive conduct. "Even the largest firms may engage in hard competition, knowing that this will enlarge their market shares." *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.,* 784 F.2d 1325, 1339 (7th Cir.1986).

Plaintiffs, however, have been successful in securing merchandising contracts with CMO3 stores, which suggests that CIV sold in CMO3 stores is an inappropriate figure for the foreclosure analysis. Of the 34% of CIV sold by stores with a CMO3 contract, approximately one-half is sold by CMO3 stores that also have an RJR contract. On April 29, 2001, RJR had a merchandising contract with 15,591 CMO3 stores, which increased to 22,223 CMO3 stores on September 13, 2001. B & W also had increased its penetration in stores on CMO3 contracts. On April 29, 2001, approximately 12% of CIV sold by CMO3 stores was sold through stores that also had a B & W merchandising contract. By September 13, 2001, the amount of CIV sold by CMO3 stores that also had B & W merchandising contracts had increased to approximately 19.4% of CIV.

Although the court believes that 14% of CIV representing "PM exclusive" stores is the more appropriate foreclosure percentage,[20] the court, viewing the record in the light most favorable to Plaintiffs, will assume a foreclosure percentage of 34% for the substantial foreclosure analysis. Because Plaintiffs have temporary and permanent opportunities to promote their products in CMO3 stores, Plaintiffs must be foreclosed, if at all, from less than 34% of the relevant market. Even assuming, however, that Plaintiffs are foreclosed from 34% of the relevant market, Plaintiffs are not foreclosed from a substantial share of the relevant market.

Each Plaintiff has increased the market penetration of its merchandising contracts in terms of CIV.[21] RJR has increased its percentage of CIV with RJR merchandising contracts, giving it at least its market share of highly visible display space. RJR has also increased its percentage of CIV with Bonus contracts, which provide RJR with significantly more than its market share of what it considers highly visible space. Furthermore, B & W and Lorillard have been successful in signing retail stores to merchandising contracts following the implementation of Retail Leaders. B & W has increased its penetration in stores on CMO3 contracts. Lorillard has its highest level contract in 7% more pack outlets after Retail Leaders than before Retail Leaders.

The record shows that Plaintiffs can successfully compete against Retail Leaders, which supports the conclusion that Plaintiffs are not foreclosed from a substantial share of the relevant market. *See Western Parcel Express v. United Parcel Serv. of Am., Inc.,* 190 F.3d 974 (9th Cir.1999) (affirming summary judgment and citing

---

**20.** Because these stores are not truly "PM exclusive," 14% may be too high as well. Retailers generally carry manufacturers' products in these stores even though they do not have merchandising contracts in these stores. Furthermore, Plaintiffs are free to negotiate merchandising contracts with these stores.

**21.** Plaintiffs argue that the increased penetration of their merchandising programs is the result of lowering their requirements that retailers must meet. PM's increased penetration, however, is also a result, at least in part, of PM relaxing signage restrictions and increasing promotional payments. The effect of the parties lowering the requirements imposed on retailers who wish to sign merchandising contracts is to increase competition for retail display and advertising space at the precontract stage.

evidence that two other companies, out of several in the market, had entered or widened their presence in the market during the relevant period). The combined market share of RJR's investment brands has increased during 2001. It has successfully introduced new products, and RJR's revenues, profits, and cash reserves have increased since the introduction of Retail Leaders. Although Lorillard suffered an overall decline in market share following the implementation of Retail Leaders, Newport, its key premium brand, continues to gain market share following the implementation of Retail Leaders. Furthermore, following the implementation of Retail Leaders, Lorillard has earned record profits in 1999 and 2000. Finally, B & W's market share increased during 2001. Therefore, Plaintiffs' success following the implementation of Retail Leaders indicates that they are not foreclosed from a substantial share of the relevant market.

Plaintiffs' speculation that any lack of success that they have experienced since the introduction of Retail Leaders has been caused by the elements of Retail Leaders that it now challenges is not supported by the record. The rate of decrease in RJR's and B & W's market shares over the past two years is not inconsistent with the long-term downward trends during the two decades prior to Retail Leaders. Two and one-half years of Retail Leaders experience indicates no change in the long-term trend before Retail Leaders.

In addition to the foreclosure percentage, the court must consider other factors relating to the nature of the market. Each of these factors, in addition to Plaintiffs' success following the implementation of Retail Leaders, indicate that Plaintiffs are not foreclosed from a substantial share of the market.

Retail Leaders poses a less significant threat to competition because its agreements are of short-term duration. Retail Leaders contracts are terminable at will without penalty upon thirty days' notice. The Fourth Circuit has held that exclusive contracts terminable after thirty days to one year do not have substantial anticompetitive effects. *Thompson Everett,* 57 F.3d at 1326 (affirming summary judgment for defendants); *see also Omega Envtl., Inc. v. Gilbarco, Inc.,* 127 F.3d 1157, 1163–64 (9th Cir.1997) (stating that "the short duration [up to one year] and easy terminability of these agreements negate substantially their potential to foreclose competition"); *Paddock Publ'ns, Inc. v. Chicago Tribune Co.,* 103 F.3d 42, 47 (7th Cir.1996) (stating "the FTC and the Supreme Court concluded that even exclusive dealing contracts are lawful if limited to a year's duration"); *U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 596 (1st Cir.1993) (stating that thirty-day exclusivity clause is normally a *de minimis* constraint); XI Hovenkamp, *Antitrust Law* ¶ 1821d3 ("We suggest presumptively that periods of less than one year be approved...."). Because Retail Leaders agreements are terminable at will with thirty days' notice, retail product and display space are subject to uninterrupted competitive bidding, and Plaintiffs are not substantially foreclosed from the relevant market.

"[E]ven a high foreclosure percentage will not exclude competition if the period covered by the exclusive dealing arrangement is short *and* there are no other impediments to switching." XI Hovenkamp, *Antitrust Law* § 1821d3; *see also Concord Boat,* 207 F.3d at 1059 (holding that the defendant did not substantially foreclose the plaintiffs and stating the boatbuilders "were free to walk away from the discounts at any time, and they in fact switched to OMC engines at various points when that manufacturer offered superior discounts").

Plaintiffs argue that the terminability provisions of Retail Leaders agreements are illusory because retailers cannot afford to have fewer weeks of Marlboro "buy-downs" (reimbursements paid to retailers for reducing retail prices) than their competitors. The record, however, does not support Plaintiffs' argument. Retailers often move from a high level of Retail Leaders to lower levels of Retail Leaders, and some retailers cease participating in Retail Leaders altogether. From December 1999 to July 2001:(1) more than 10,000 retailers ceased participating at the highest level of Retail Leaders, either by switching to a lower level or departing the program altogether; (2) more than 1,400 retailers at the highest level of Retail Leaders ceased participating in Retail Leaders altogether; and (3) more than 5,500 retailers at some level of Retail Leaders ceased participating in the program altogether.[22] Furthermore, retailers frequently decline the level with the highest amount of Marlboro discounts (CMO3). Approximately 63% of PM's workload (approximately 200,000 stores) have not signed a CMO3 contract. Between 44% and 55% of retailers that are eligible for and that have been offered CMO3 contracts have refused them.

Plaintiffs also argue that PM's high market share and strong customer preference "coerce" retailers into signing Retail Leaders agreements and therefore make the terminability provisions of Retail Leaders agreements illusory. It is undisputed that PM's market share is driven by the success of its Marlboro brand.[23] The strong position of Marlboro, however, does not, standing alone, "coerce" retailers into signing Retail Leaders agreements. *See Ome-*

*ga Envtl.,* 127 F.3d at 1164 ("We agree with the unremarkable proposition that a competitor with a proven product and strong reputation is likely to enjoy success in the marketplace, but reject the notion that this is anticompetitive. It is the essence of competition."). Due to the success of Marlboro, PM enjoys competitive advantages, including promotional and advertising advantages and higher sales, which the Sherman Act does not prohibit. *See Olympia Equip. Leasing Co. v. Western Union Tel. Co.,* 797 F.2d 370, 375, 378 (7th Cir.1986) ("[I]t is clear that a firm with lawful monopoly power has no general duty to help its competitors, whether by holding a price umbrella over their heads or by otherwise pulling its competitive punches.... Advertising a competitor's products free of charge is not a form of cooperation commonly found in competitive markets; it is the antithesis of competition."); *see also Ball Mem'l Hosp.,* 784 F.2d at 1339 (stating that "[e]ven the largest firms may engage in hard competition, knowing that this will enlarge their market shares"); *Louisa Coca–Cola,* 94 F.Supp.2d at 814, 817 (granting summary judgment and stating, "There is probably no question that Pepsi's promotions influence retailers to give more space to Pepsi products. When Pepsi gets more space, others will obviously get less. There is no evidence, however, that Pepsi can control the retailers' decisions or has the power to exclude its rivals' products outright.").

Plaintiffs contend that high conversion costs associated with switching to another merchandising agreement makes Retail Leaders difficult to terminate as a practical matter. The record, however, does

---

**22.** When considering the coercive effect of Retail Leaders, it is proper to focus on the number of stores that are "coerced" because each store makes an individual decision whether or not, and at what level, to sign a Retail Leaders agreement.

**23.** RJR's Chief Executive Officer recognizes this and attributes Marlboro's success to "great positioning, great advertising, you know, a really good product." (Schindler, March 27, 2001, Dep. at 40.)

not support this allegation. Under normal practice in the cigarette industry, reconfiguration will be carried out by the manufacturer that benefits from the rearrangement.

Furthermore, the record does not support Plaintiffs' argument that the strength of the Marlboro brand prevents adult smokers from switching to another brand. At the beginning of this litigation, the parties provided data that indicated that between 1997 and 1999 approximately 6 million adult smokers, representing approximately 14% of that population, switched their usual brand. Plaintiffs concede that Marlboro smokers are price sensitive. No evidence in the record, however, indicates that Plaintiffs have attempted to compete with Marlboro on the basis of price by lowering the price of their premium brands.

Because PM's competitors can sell and advertise their products in all Retail Leaders stores, adult smokers have the ability to comparison shop. Retail Leaders agreements neither place restrictions on the availability of competitive products nor place restrictions on the price at which competitive products are sold.

Plaintiffs' substantial foreclosure claims must be tested against the full range of selling and advertising opportunities available. *CDC Techs., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 80 (2d Cir.1999) ("if competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether exclusive dealing arrangements with distributors foreclose from competition *any* part of the relevant market") (quotation and citations omitted); *Ryko Mfg.*, 823 F.2d at 1234 (factors relevant to the foreclosure analysis include "the availability of alternative methods of distribution"). Plaintiffs have other non-retail marketing opportunities to communicate with adult smokers. RJR spends roughly $600 million, approximately three times what it spends on retail merchandising, on non-retail merchandising, such as print advertising, direct mail, event promotions, sponsorships, sweepstakes, relationship programs, discount coupons, and continuity programs. Lorillard has increased its "direct consumer promotions" (which includes buydowns) since the implementation of Retail Leaders. Lorillard's direct consumer promotions rose from about $206 million in 1998 to about $396 million in 2000. B & W spent approximately $96.2 million in 2000 on direct mail discounting. Furthermore, in 2001, B & W initiated a $9 million direct marketing campaign, its largest in history, in support of its Pall Mall line extension.

Even assuming Plaintiffs' best-case scenario of 34% foreclosure, Plaintiffs' success following the implementation of Retail Leaders and the nature of the market demonstrate that Retail Leaders does not foreclose Plaintiffs from a substantial share of the relevant market. Despite Retail Leaders, Plaintiffs have significant opportunities to sell, display, and promote their products in retail stores. Because Plaintiffs are not substantially foreclosed from the relevant market, there can be no adverse effect on competition due to Retail Leaders. *See Microsoft*, 253 F.3d at 69.

Because Plaintiffs failed to establish that PM possesses market power and substantial foreclosure, the court need not address whether PM has legitimate pro-competitive justifications for Retail Leaders.

### 2. *Section 2 of the Sherman Act*

Plaintiffs contend that PM's Retail Leaders program constitutes an exclusionary practice by a monopolist and/or attempted monopolization in violation of Section 2 of the Sherman Act. Section 2 of the Sherman Act declares it unlawful to "monopolize, or attempt to monopolize ... any

part of the trade or commerce among the several States." 15 U.S.C. § 2.

■ To prevail on a monopolization claim under Section 2 of the Sherman Act, Plaintiffs "must show possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner, and causal antitrust injury." *Advanced Health–Care,* 910 F.2d at 147 (citations omitted). To prevail on an attempted monopolization claim, Plaintiffs must demonstrate (1) a specific intent to monopolize a relevant market; (2) predatory or anticompetitive acts; and (3) a dangerous probability of successful monopolization. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *Advanced Health–Care,* 910 F.2d at 147.

Courts have imposed on antitrust plaintiffs certain threshold showings as to market share in a relevant market before they may proceed on a monopolization claim. This shorthand method is necessary because it is quite often difficult to determine through direct evidence whether monopoly power, the ability to restrict output and thereby raise prices to supracompetitive levels, exists. *See* IIA Areeda *et al., Antitrust Law* § 501, and IIIA Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 801 (1996); *see also United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (defining monopoly power as "power to control prices or exclude competition") (quotation omitted); *Tops Markets, Inc. v. Quality Markets, Inc.,* 142 F.3d 90, 98 (2d Cir.1998) ("[Monopoly power] may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market.") (citation omitted); *Rebel Oil,* 51 F.3d at 1434 (indirect evidence of monopoly power "more common" type of proof in Section 2 claim).

■ Seventy to seventy-five per cent is generally considered the minimum market share necessary to support a finding of monopoly power. *White Bag Co. v. International Paper Co.,* 579 F.2d 1384, 1387 (4th Cir.1974) (noting that monopoly power is usually found when defendant controls 70% to 100% of the market); *see also Tops Markets,* 142 F.3d at 99 (stating that market share of over 70% is usually "strong evidence" of monopoly power, although not conclusive); *Reazin v. Blue Cross & Blue Shield of Kan., Inc.,* 899 F.2d 951, 967 (10th Cir.1990) (noting that most lower courts require minimum showing of 70% to 80% market share for plaintiff to establish market power) (citations omitted); IIIA Areeda & Hovenkamp, *Antitrust Law* § 801 (advocating a 70% to 75% threshold).

■ PM's 51.3% market share falls far below the generally-accepted 70% to 75% minimum share necessary to support a finding of monopoly power. Furthermore, monopoly power is a higher degree of power than market power. *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) ("Monopoly power under § 2 requires, of course, something greater than market power under § 1.") (citation omitted). Because PM does not possess market power in the relevant market, *supra* Part A.1.a., *a fortiori* PM does not possess monopoly power in the relevant market. Therefore Plaintiffs' Section 2 monopolization claim fails as a matter of law.

■ Furthermore, Plaintiffs' monopolization and attempted monopolization claims fail because Plaintiffs have failed to present any evidence demonstrating the existence of exclusionary conduct or anticompetitive acts. Plaintiffs allege the same conduct (PM's Retail Leaders program) as the basis for their Section 1 and

Section 2 claims. The court, *supra*, Part A.1.b., found that Retail Leaders could not constitute a Section 1 violation because Retail Leaders does not foreclose a substantial portion of the relevant market, and accordingly cannot adversely affect competition. In that Retail Leaders does not constitute an anticompetitive act[24] and because Plaintiffs have alleged no other anticompetitive acts, Plaintiffs' monopolization and attempted monopolization claims fail as a matter of law.

### 3. *Antitrust Injury*

 The antitrust laws "were enacted for the protection of *competition,* not *competitors.*" *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 110, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) (quotation omitted). Thus, for any of Plaintiffs' federal claims to survive, Plaintiffs must demonstrate an antitrust injury, which is defined as an "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants acts unlawful.'" *Allegheny Pepsi–Cola Bottling Co. v. Mid–Atlantic Coca–Cola Bot-*

*tling Co.,* 690 F.2d 411, 414 (4th Cir.1982) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). To establish an antitrust injury, Plaintiffs' losses must stem from anticompetitive acts of PM's Retail Leaders program that "'reduce output or raise prices to consumers.'" *Continental Airlines, Inc. v. United Airlines, Inc.,* 277 F.3d 499, 516 (4th Cir.2002) (quoting *Chicago Prof'l Sports Ltd. P'ship v. NBA,* 961 F.2d 667, 670 (7th Cir.1992)).

Plaintiffs failed to establish an antitrust injury. No evidence indicates that Plaintiffs' losses, if any, are a result of anticompetitive activity associated with Retail Leaders. Plaintiffs also have not alleged that PM has reduced output. Finally, any increase in cigarette prices is not due to Retail Leaders. Because Plaintiffs failed to establish an antitrust injury, their federal claims fail as a matter of law.

### B. *Plaintiffs' State Claims*

 Plaintiffs also claim that Retail Leaders violates Sections 75–1, 75–1.1, 75–

---

**24.** Courts have long found that conduct which does not support a Section 1 claim cannot support a Section 2 claim. *Williams v. I.B. Fischer Nevada,* 999 F.2d 445, 448 (9th Cir.1993) (quoting *Thomsen v. Western Elec. Co.,* 680 F.2d 1263, 1267 (9th Cir.1982)) ("[A] § 1 claim insufficient to withstand summary judgment cannot be used as the sole basis for a § 2 claim."); *Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 543 (9th Cir.1983) (holding that because the conduct the plaintiff alleged in support of its Section 1 claim is not anticompetitive, "it is of no assistance to [the plaintiff's] efforts to state a claim for relief for monopolization or attempted monopolization, both of which require at least some allegation of anticompetitive conduct"), *overruled on other grounds, Hasbrouck v. Texaco, Inc.,* 842 F.2d 1034, 1043 (9th Cir.1987); *see also United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) ("[T]he two sections overlap in the sense that a monopoly under § 2 is a species of restraint under § 1.") (citing

*Standard Oil Co. v. United States,* 221 U.S. 1, 59–61, 31 S.Ct. 502, 55 L.Ed. 619 (1911)).

Plaintiffs cite the *Microsoft* case in arguing that their Section 2 claims can survive even if their Section 1 claim does not. The *Microsoft* court did identify a small window through which a Section 2 claim could pass, surviving the failure of a Section 1 claim based upon the same conduct; however, the *Microsoft* window is open only to claims against monopolists, and even then in limited circumstances involving exclusive contracts. *United States v. Microsoft Corp.,* 253 F.3d 34, 70 (D.C.Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 350, 151 L.Ed.2d 264 (2001) ("[A] monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation."). Because PM is not a monopolist, *supra* Part A.2.a., the *Microsoft* window is not open for Plaintiffs.

2, and 75–2.1 of the North Carolina General Statutes and North Carolina's common law of unfair competition. Plaintiffs' state claims are based on the same allegations that form the basis for their federal claims. Plaintiffs allege no additional facts that are unique to their state claims.

Because Plaintiffs do not allege any facts that suggest that Defendant's conduct is unlawful beyond the conduct that is the basis for their failed federal claims, Plaintiffs' state common law and statutory claims fail as well. *See generally ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 48 (4th Cir.1983), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985); *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 655–57, 194 S.E.2d 521, 529–30 (1973).

Although some courts have interpreted North Carolina General Statutes Section 75–1.1 to prohibit "commercial 'unfairness' and 'deception' beyond traditional antitrust concepts," *L.C. Williams Oil Co. v. Exxon Corp.*, 625 F.Supp. 477, 481 (M.D.N.C. 1985) (citing *Marshall v. Miller*, 302 N.C. 539, 549, 276 S.E.2d 397, 403 (1981)), Plaintiffs have failed to present evidence of any unfair and deceptive trade practices. Plaintiffs have alleged that "PM's use of market power to compel retailers to accept restrictive Retail Leaders contracts falls within the scope of 'coercive tactics' prohibited by § 75–1.1." (Mem. of Pls. in Opp'n to Mot. of Def. for Summ.J., at 49.) As discussed above, Defendant does not possess market power and Retail Leaders agreements are not coercive. Therefore, because Plaintiffs' federal claims fail, Plaintiffs' state claims also fail for essentially the same reasons as discussed above.[25]

---

**25.** Defendant has also filed motions seeking to exclude portions of the expert reports, declarations, and anticipated testimony of Plaintiffs' economic experts. Because Defendant's motions are directed primarily at portions of

Based on the findings of fact set out above, and for the reasons discussed, the court makes the following conclusions of law.

## CONCLUSIONS OF LAW

1. The relevant market is all retail sales of cigarettes in the United States.

2. Two and one-half years of actual market experience is a reasonable period of time for the court to evaluate Defendant's challenged conduct.

3. There is no evidence of supracompetitive prices, reduced output, or lowered quality in the relevant market as a result of Defendant's Retail Leaders program.

4. Defendant does not have the ability to raise prices above those that would be charged in a competitive market and cannot restrict output without regard to competition.

5. There has been significant new entry into the relevant market in the last four years.

6. There is significant excess capacity in the cigarette industry as well as existing channels of distribution.

7. Defendant does not have market power.

8. Defendant's Retail Leaders program has induced rivals to compete more vigorously.

9. There are higher levels of discounting in the cigarette market since Retail Leaders, which benefits consumers.

10. Retail Leaders does not unreasonably deny consumers needed information, or disrupt the price-setting mechanism of the market.

the experts' opinions which the court has found to be insufficiently tied to the facts or contrary to the undisputed evidence in the record, the court need not address the objections independently.

11. Retail Leaders provides current benefits to consumers and there is no evidence of reasonably foreseeable future harm to consumer welfare.

12. Defendant's Retail Leaders program is not anticompetitive and does not harm consumers.

13. Plaintiffs are not foreclosed from a substantial share of the relevant market.

14. Plaintiffs have the ability to obtain significant market penetration for their merchandising programs.

15. Retail Leaders contracts are easily terminable without penalty with thirty days' notice.

16. Retail Leaders does not restrain competition in the relevant market.

17. In the two and one-half years since Defendant implemented its challenged Retail Leaders program, the cigarette market in the United States remains highly competitive, as evidenced by the general stability of market shares in the light of long-term trends, the profitability of the Plaintiffs, and the ongoing entry and increasing market share of new manufacturers.

18. Plaintiffs have not suffered an antitrust injury.

19. Defendant's implementation of its Retail Leaders program does not violate either Section 1 or Section 2 of the Sherman Act, North Carolina General Statute §§ 75-1, 75-1.1, 75-2, and 75-2.1, or the common law of North Carolina.

20. Because there are no genuine issues of material fact and because Defendant is entitled to judgment as a matter of law, summary judgment will be entered for the Defendant and these consolidated cases will be dismissed with prejudice.

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

*ORDER and JUDGMENT*

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendant's motion for summary judgment [Doc. # 255 in 1:99CV185; Doc. # 234 in 1:99CV207; and Doc. # 234 in 1:99CV232] is **GRANTED,** and these consolidated cases are **DISMISSED** with prejudice.

IT IS FURTHER ORDERED that the preliminary injunction [Doc. # 65 in 1:99CV185; Doc. # 50 in 1:99CV207; and Doc. # 51 in 1:99CV232] entered in these cases on June 29, 1999, is **DISSOLVED.**